In re KAR DEVELOPMENT
ASSOCIATES, L.P.,
Debtor.

CITY OF OLATHE, KANSAS, Security
Bank of Kansas City, and Alchemedes/Olathe Inn Limited Partnership,
Appellants,

v.

KAR DEVELOPMENT ASSOCIATES,
L.P., Appellee.

Civ. A. No. 94–2323–GTV.
Bankruptcy No. 93–22056–11.

United States District Court,
D. Kansas.

March 3, 1995.

R. Pete Smith, Jonathan A. Margolies, McDowell, Rice & Smith, P.C., Kansas City, MO, for KAR Development Associates, L.P.

Mark A. Shaiken, Lucinda S. Woolery, Stinson, Mag & Fizzell, Kansas City, MO, for

City of Olathe, Kan., Security Bank of Kansas City, Alchemedes/Olathe Inn Ltd. Partnership.

## MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

This is an appeal from an order of the bankruptcy court which held that a lease established pursuant to provisions of the Kansas Economic Development Revenue Bond Act is not a true lease and therefore not subject to the assumption/rejection requirements of § 365 of the Bankruptcy Code.[1] The debtor has filed a cross-appeal challenging the bankruptcy court's ruling that certain revenues are cash collateral subject to a security interest under § 363. For the reasons discussed below, the order of the bankruptcy court is affirmed.

### I. Factual and Procedural Background

This summary provides the general background necessary to understand the issues on appeal. The issues before the court are primarily legal ones; the bankruptcy court's findings of fact are for the most part not in dispute.

KAR Development Associates, L.P. ("KAR" or "debtor"), a Kansas limited partnership, operates a Holiday Inn hotel in Olathe, Kansas. The City of Olathe issued industrial revenue bonds ("IRB" or "bonds") to finance part of the construction of the hotel. This was done pursuant to the Kansas Economic Development Revenue Bond Act, K.S.A. §§ 12–1740 to 12–1749a, which empowers a city "to issue revenue bonds, the proceeds of which shall be used for the purpose of paying all or part of the cost of purchasing ... facilities for ... commercial development." K.S.A. § 12–1740.

KAR's general partner purchased the real estate for the hotel project and deeded the property to the City in a sale and lease-back transaction that was part of the IRB process. The IRB statutes require that title to the property be formally vested in the City. The hotel was financed by the proceeds of the $6,000,000 IRBs and $2,645,000 in cash equi-

ty provided by the KAR general and limited partners.

As part of the IRB transaction, KAR and the City entered into a lease agreement. Under the lease provisions, KAR agreed to lease the hotel from the City, which owned the property, for a term of 24 years, with the option to purchase the hotel at the end of the lease term. The amount of rent provided in the lease was calculated to be the exact amount of the principal and interest payments due on the bonds. KAR was to pay that rent to Security Bank of Kansas City ("Security"), which acted as fiscal agent and which would in turn make the required payments on the bonds. Security remains the fiscal agent for the IRB transaction and receives a fee for its services. The lease also provides that upon KAR's default and the transmission of applicable default notices, KAR's right to possess the hotel ceases, the lease may be terminated, and the City is permitted to re-enter and take possession of the hotel. KAR is required to surrender possession of the hotel upon a default.

Anchor Savings Association ("Anchor") pledged collateral for the bonds in the form of marketable securities. Under this collateral pledge agreement, the pledged securities were made the primary collateral for the bond debt, ahead of the hotel property. Anchor was later declared insolvent and the Resolution Trust Corporation (RTC) was appointed as Anchor's receiver. The RTC purchased the bonds from their original holder and thereby acquired the bondholder's lien against the securities Anchor had pledged as the primary collateral for the bonds. RTC retained the pledged collateral securities and offered the bonds for sale based on the value of the hotel which remained as the only bond collateral. Alchemedes/Olathe Inn Limited Partnership ("Alchemedes") purchased the bonds from the RTC and currently owns them.

Prior to commencing this bankruptcy case, KAR defaulted on its obligations under the lease. On October 21, 1993, Security and the

1. Unless otherwise noted, section numbers refer to the Bankruptcy Code provisions found at Title 11 of the United States Code.

City notified KAR of its defaults under the terms of the lease and of the acceleration of all amounts due, and demanded that KAR vacate the premises.

KAR filed a voluntary Chapter 11 petition on October 25, 1993, and has remained as a debtor-in-possession of the hotel since then. On November 5, 1993, Alchemedes, the City, and Security filed a joint motion for relief from the automatic stay, pursuant to 11 U.S.C. § 362, in order to evict KAR and obtain possession of the hotel property. The success of this motion depends upon the classification of the IRB transaction under the Bankruptcy Code.

In the motion for relief, the creditors sought a ruling that the lease was subject to 11 U.S.C. § 365. Section 365 governs the relationship between a landlord and a tenant when the tenant commences a bankruptcy case, and requires that the tenant must assume or reject an unexpired lease within 60 days after the bankruptcy case is filed. § 365(d)(4). To "assume," or retain, the lease, the debtor must cure all defaults under the lease, including past due rent, and provide adequate assurance that it will perform its future obligations under the lease. If the lease is not timely assumed, it is deemed rejected and the lease is terminated. § 365(g). If, however, the IRB transaction is determined to be a secured transaction rather than a true lease, then the bondholder's claim is classified as a secured bond debt rather than rent, restructuring of the claim would be possible, and the hotel would remain property of the bankruptcy estate.

The bankruptcy court conducted an evidentiary hearing on the motion for relief on May 19–23, 1994, and issued its ruling in a Memorandum Opinion entered August 5, 1994. The court held that it was not bound by a series of Kansas state court decisions which determined that lease agreements pursuant to IRB transactions were true leases. Instead, the court examined the substance of the transaction and determined that the parties created a financing lease with bond debt, and not a landlord-tenant relationship as under a true lease. The court found that KAR is the equitable owner of the hotel under a security agreement with the successor bond-

holder, Alchemedes. The court held that Alchemedes' claim is not for rent but rather for bond debt subject to § 1129(b)(2)(A) treatment, and that § 365 does not apply to the transaction. According to the court, the hotel remains property of the bankruptcy estate and is subject to the restructuring prerequisites of the Code. Finally, the court held that the hotel revenues are cash collateral subject to Alchemedes' security interest under § 363 and that KAR shall not use such revenues without the consent of Alchemedes until the court can hear evidence on whether Alchemedes' lien is adequately protected.

## II. Issues on Appeal

Alchemedes, the City, and Security filed a timely appeal in which the following issues were identified: (1) whether the bankruptcy court erred in holding that Kansas state law should not be applied to decide whether the lease between the City and KAR is an unexpired lease for purposes of 11 U.S.C. § 365; and (2) whether the bankruptcy court erred in holding that it is not bound by an earlier bankruptcy court decision which was upheld by a district court in this district and by the United States Court of Appeals for the Tenth Circuit.

KAR filed a cross-appeal in which it challenges the bankruptcy court's ruling that the hotel revenues are to be treated as cash collateral subject to Alchemedes security interest under § 363.

## III. Jurisdiction

■ This court has jurisdiction of the appeal pursuant to 28 U.S.C. § 158(a) because it is an appeal from a final judgment and order of the bankruptcy court. The bankruptcy court's order denied appellants' motion for relief from the § 362 automatic stay. Courts have consistently held that orders granting or denying relief from an automatic stay are appealable final orders. *See Eddleman v. United States Dept. of Labor*, 923 F.2d 782, 784 (10th Cir.1991).

■ The court also has jurisdiction over the cross-appeal in which appellee challenges the bankruptcy court's ruling that the hotel revenues of the debtor are to be treated as cash collateral pursuant to § 363. Although the cash collateral ruling alone may not be

considered a final order, *see In re Wiston XXIV Ltd. Partnership,* 147 B.R. 575, 578 (D.Kan.1992), *appeal dismissed,* 988 F.2d 1012 (10th Cir.1993), in bankruptcy proceedings an order is final when it disposes of a " 'particular adversary proceeding or discrete controversy pursued within the broader framework cast by the petition.' " *In re Cascade Energy & Metals Corp.,* 956 F.2d 935, 938–39 (10th Cir.1992) (quoting *In re Durability, Inc.,* 893 F.2d 264, 266 (10th Cir.1990)). In this case, the cash collateral issue was so closely tied to the question of relief from the automatic stay that both issues constitute a discrete controversy. The bankruptcy court's order on both issues is therefore final for purposes of appeal pursuant to 28 U.S.C. 158(a).[2]

## IV. Standard of Review

▉ In reviewing decisions of the bankruptcy court, the district court must accept the factual findings of the bankruptcy court unless they are clearly erroneous. *Virginia Beach Federal Sav. & Loan Ass'n v. Wood,* 901 F.2d 849, 851 (10th Cir.1990); *Branding Iron Motel, Inc. v. Sandlian Equity, Inc. (In re Branding Iron Motel, Inc.),* 798 F.2d 396, 399 (10th Cir.1986). The district court, however, must review the bankruptcy court's legal conclusions *de novo. Wood,* 901 F.2d at 851; *Branding Iron Motel,* 798 F.2d at 399–400. Mixed questions of law and fact are subject to *de novo* review if such mixed questions involve "primarily a consideration of legal principles." *Matter of Tri–State Equip., Inc.,* 792 F.2d 967, 970 (10th Cir. 1986). This court may set aside findings of fact only if they are clearly erroneous. *Crawford v. Green (In re Crawford),* 135 B.R. 128, 130 (D.Kan.1991).

▉ KAR argues that the bankruptcy court's holding regarding the nature of the IRB lease should be subject to the clearly erroneous standard. In support, KAR cites Tenth Circuit decisions which characterize bankruptcy courts' findings concerning the nature of support obligations as factual questions. *See In re Sampson,* 997 F.2d 717, 721 (10th Cir.1993); *In re Goin,* 808 F.2d 1391, 1393 (10th Cir.1987). While a determination of the nature of support obligations is analogous to the bankruptcy court's findings regarding the lease in this case, the primary issue on appeal here is a purely legal one, namely whether the court is bound to adopt the characterization of the lease agreement supplied by state law. The court does not perceive any factual disputes related to the bankruptcy court's conclusions regarding the nature of the transaction. As a result, the court will apply a de novo review to the bankruptcy court's ruling on that issue.

## V. Analysis

### A. Characterization of the Lease Agreement

This is the principal issue on appeal. The parties do not dispute the bankruptcy court's finding that if Kansas state law is applied then the lease executed pursuant to the Kansas IRB statute must be characterized as a true lease and the transaction must be declared subject to § 365. Nor do the parties disagree with the finding that if an "economic realties" test is used to characterize the transaction, it would be characterized as a security agreement rather than a true lease and § 365 would not apply. The issue on appeal boils down to the following: (1) Is the court bound to adopt the characterization supplied by state law? (2) If not, should the economic realities test be used?

#### 1. Bankruptcy Code Provisions and Case Law

Section 365(a) gives the trustee, or debtor-in-possession in Chapter 11 cases, the power to assume or reject executory contracts or unexpired leases.[3] Section 365(b) imposes

---

**2.** The district court also has jurisdiction to hear appeals from interlocutory orders of bankruptcy judges with leave of the court. Under the facts of this case, such leave would be granted and therefore the court would have jurisdiction over the appeal and cross-appeal even if the order of the bankruptcy court is not considered final.

**3.** Section 365(a) provides in pertinent part as follows:

(a) [T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

certain requirements when a trustee wishes to assume an executory contract or unexpired lease under which there has been a default. The trustee must cure the default or make adequate assurance that it will be cured, compensate any parties suffering pecuniary loss from the default, and provide adequate assurance of future performance under the contract or lease.[4] Finally, the Code fixes the time within which the trustee may act to assume or reject an unexpired lease or executory contract. Section 365(d) provides that leases of nonresidential real estate will be deemed rejected unless assumed within 60 days after an order for relief unless the court, for cause, grants additional time during that 60–day period.[5]

The terms "executory contract" and "unexpired lease" as used in § 365 are not defined in the Code. The legislative history for that section indicates only that an executory contract is one on which performance remains due on both sides, and that a note will generally not be considered an executory contract

when the only performance remaining is repayment.[6] The term "lease of nonresidential real property" found in § 365(d)(4) also remains undefined. Section 365(m) provides only that "for purposes of [section 365] ... leases of real property shall include any rental agreement to use real property."

Both sides have cited other Code sections and their legislative histories to support their respective views on the role state law should play in deciding whether an agreement is considered a lease under § 365. The bankruptcy court looked to § 502(b)(6), a section which limits damage claims, resulting from lease terminations, which are allowable to a debtor's landlord.[7] The term "lease of real property" used in that section is not defined, but the legislative history makes clear that it "applies only to a 'true' or 'bona fide' lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security." [8] S.Rep. No. 598, 95th Cong., 2d Sess.

---

4. Section 365(b) provides in pertinent part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

5. Section 365(d) provides in pertinent part as follows:

> (d)(4) [I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is a lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4).

6. The report of the Senate Judiciary Committee discussing § 365 states as follows:

> Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844.

7. This section was originally enacted as § 502(b)(7) as part of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598. It was redesignated as § 502(b)(6) by the Bankruptcy Amendments and Federal Judgeship Act of 1987, Pub.L. No. 98–353.

8. The Senate Judiciary Committee's report also stated as follows:

> Whether a "lease" is true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease". The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the

64, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5850. The factors cited in the report for determining whether a lease is a "financing" lease rather than a "true" or "bona fide" lease comprise what may be referred to as an economic realities test. In this case, the bankruptcy court used such a test to conclude that the IRB transaction was not a true lease. While the parties disagree on whether an economic realities test should have been used, there is no dispute as to the bankruptcy court's conclusion after applying the test to the facts of this case.

A number of courts have applied the bona fide lease requirement found in the legislative history to § 502(b)(6) when determining the scope of § 365. The Second Circuit found that the bona fide lease requirement of § 502(b)(6) is properly applied to § 365(d) because those sections, "read together, are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings." *In re PCH Associates,* 804 F.2d 193, 199 (2d Cir.1986). The Ninth Circuit has also concluded that the two sections are interrelated and that the bona fide lease standard is applicable to determining the scope of § 365. The court in *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 1182 (9th Cir.1988) reasoned as follows: "Rejection of an executory contract or an unexpired lease under section 365(d) constitutes a breach under section 365(g). The breach permits the creditor/landlord to seek allowance of its claim under section 502." A number of other courts have used the legislative history of § 502(b)(6) as a guide in interpreting the meaning of "lease of nonresidential real property" in § 365(d)(4). *See, e.g., International*

*Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 750 (2d Cir.1991); *In re Hotel Syracuse, Inc.,* 155 B.R. 824, 838 (Bankr.N.D.N.Y.1993); *In re Tak Broadcasting Corp.,* 137 B.R. 728, 732 (W.D.Wis.1992); *In re McLean Enterprises, Inc.,* 105 B.R. 928, 934 (Bankr.W.D.Mo.1989).

Appellants point to the legislative history of § 101(51), the Code's definition of "security interest." The committee reports discussing that section state: "Whether ... a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." H.R.Rep. No. 595, 95th Cong., 2d Sess. 314 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6271.[9] Appellants argue that this interpretation is controlling in light of the bankruptcy court's holding that Alchemedes holds a security interest in the hotel.

Kansas courts have consistently held that IRB transactions constitute "true leases." *See, e.g., Misco Indus., Inc. v. Board of Sedgwick County Commissioners,* 235 Kan. 958, 685 P.2d 866 (1984) (IRB lease not a mortgage and party not required to pay mortgage registration tax to register of deeds); *In re City of Moran,* 238 Kan. 513, 713 P.2d 451 (1986) (IRB lease not subject to filing requirements of Kansas Uniform Commercial Code; *Bank of Alton v. Tanaka,* 247 Kan. 443, 799 P.2d 1029 (1990) (holding that defaulting tenant under IRB lease could be evicted and lease was not an equitable mortgage subject to being foreclosed). While these cases do not characterize the IRB transaction in the bankruptcy context, such would be the case for any state law or statute, because state courts have no jurisdiction

---

leased property for no additional consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5850.

9. The same language is contained in the report of the Senate Judiciary Committee. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 26 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5812. This legislative history is related to the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598. At that time the definition of "security interest" was found in § 101(37). Subsequent amendments have renumbered the § 101 definitions and the definition is now found in § 101(51).

over bankruptcy matters. The parties appear to be in agreement that if the above-cited body of Kansas case law is applied here, the IRB transaction in question must be declared to be a true lease and subject to § 365.

After reviewing the Code's language and legislative history, this court is persuaded that Congress intended § 365(d)(4) to apply only to "true" or "bona fide" leases, and that the characterization is not controlled by state law. Given the relationship between sections 365(d)(4) and 502(b)(6), it is appropriate to look to the legislative history of § 502(b)(6) to interpret the meaning of "lease of nonresidential real property" found in § 365(d)(4). Nowhere in either the language of these Code sections or in the legislative history does Congress indicate that determining whether a transaction is to be considered a lease for purposes of § 365(d)(4) is controlled by state law. To the contrary, the legislative history sets forth a very specific standard to be used, based on the economic realities and the individual situation.

The fact that the Code's legislative history for the § 101(51) indicates that the term "security interest" is to be defined in accordance with applicable state law does not alter this conclusion. The focus of the inquiry in this case is the meaning of the term "lease of nonresidential real property" found in § 365(d)(4). That section is the basis of appellants' motion for relief from the automatic stay and the task of the court is to determine whether the agreements which comprise the IRB transaction constitute a lease for purposes of that section. If the court concludes that the agreements do not constitute a lease, the question of how to classify them remains. Under the facts of this case, and given the fact that no state court would reach the question of how to interpret a transaction for purposes of § 365(d)(4), it is not inconsistent with state law to find that the transaction created a security interest.

### 2. Applicability of State Law

Appellants argue that the bankruptcy court erred in not adhering to the mandate that courts in most cases must determine property rights in a bankrupt's estate in accordance with applicable state law. The leading Supreme Court decision on the question of what role state law should play in determining property rights in bankruptcy proceedings is *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). *Butner* involved a dispute between a trustee and a mortgagee over the right to rents collected during the period between the mortgagor's bankruptcy and the foreclosure sale of the mortgaged property. The issue before the Court was whether state law should determine whether a security interest in property extends to rents and profits derived from the property. *Id.* at 52, 99 S.Ct. at 916–17. The Court held that state law, rather than any federal rule of equity, should be used to determine whether such a security interest exists. *Id.* at 54, 99 S.Ct. at 917–18.

In reaching this conclusion, the Court noted that, in fashioning the Bankruptcy Code, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.* While state laws which conflict with the Code would be given no effect in a bankruptcy proceeding, the Court held that the equity power of bankruptcy courts alone is not a sufficient basis to avoid application of state law. *Id.* at 55–56, 99 S.Ct. at 918–19. The Court concluded as follows:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.... The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

*Id.* at 55, 99 S.Ct. at 918.

This view of adopting state law determinations related to property and interests in property was more recently endorsed by the Supreme Court in *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) and *BFP v. Resolution Trust Corp.,*

— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), cases decided under the current Code version. In *Barnhill,* the Court looked to state law Uniform Commercial Code provisions to determine when a transfer made by check is deemed to occur for purposes of the § 547(b) 90–day transfer rule. The *BFP* Court addressed the question of whether a mortgage foreclosure sale which conforms with state law is deemed to meet the Code's requirement that transfers of property by debtors within one year prior to filing bankruptcy be in exchange for "reasonably equivalent value." *BFP,* —— U.S. at ——, 114 S.Ct. at 1759. In rejecting Circuit Court decisions which equated reasonably equivalent value to fair market value, the Court, in a 5–4 decision, reaffirmed the primacy of state law when important state interests are at stake and held that as long as the requirements of the state's foreclosure law are complied with, the amount received at a foreclosure sale is deemed to be "reasonably equivalent value." *Id.* at ——, 114 S.Ct. at 1765. The Court found that state law should be displaced in such situations only when "the federal statutory purpose ... [is] 'clear and manifest.'" *Id.* (quoting *English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990)).

This Supreme Court directive to use state law to "fill in the gaps" of the Bankruptcy Code when property interests must be defined has led some courts to rule that state law controls when determining whether a property interest should be characterized as a lease for purposes of § 365. These courts have relied at least in part on applicable state law in determining whether financing arrangements similar to the one at issue in this case should be considered leases. The Eleventh Circuit specifically cited Alabama's industrial development statute, which forbids the development agency from acting as mortgagee, as one reason for finding that the agreement at issue was a lease subject to § 365. *See In re Martin Bros. Toolmakers, Inc.,* 796 F.2d 1435, 1440 (11th Cir.1986). Other courts have also relied in part on the characterization provided by state law when

determining whether an agreement was a lease for purposes of § 365. *See, e.g., In re Taylor,* 130 B.R. 849 (Bankr.E.D.Ark.1991) (applying state law because "lease" not defined in Code; used economic realities test from UCC); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr.S.D.N.Y.1990) (held leases of facilities built with funds from IRB's not true leases; applicable state law did not prohibit lending money and court therefore used economic realities test); *In re Harris Pine Mills,* 79 B.R. 919 (D.Or.1987) (logging contracts not leases based on state law), *aff'd,* 862 F.2d 217 (9th Cir.1988).

In an earlier case in this district both the Bankruptcy Court and District Court relied on *Butner* to resolve the same question now before the court. *See In re Petroleum Products, Inc.,* 72 B.R. 739 (Bankr.D.Kan.1987), *aff'd,* No. 87–4127–R, slip op., 1988 WL 492079 (D.Kan. Nov. 21, 1988). The courts held that Kansas case law declaring the revenue bond leases to be "true leases" was controlling and consequently the transaction was found to be subject to § 365. The Tenth Circuit affirmed the decision in an Order and Judgment entered on April 20, 1989. Pursuant to Tenth Circuit Rule 36.3, however, an Order and Judgment has no precedential value except under doctrines of law of the case, res judicata, or collateral estoppel.[10]

The bankruptcy court in this case found that because the application of state law would contravene the purposes and objectives of the Bankruptcy Code, the court was not bound by *Butner* and its progeny to adopt the characterization of the lease agreement provided by Kansas case law. The court noted that the *Butner* decision only held that a bankruptcy court's equity power cannot be used to defeat state-created rights, and that a court in that situation must apply state law. Even though a court's equity power is not a sufficient basis for overriding state law, the court's power to carry out bankruptcy objectives does provide an adequate foundation for applying a federal rule rather than state law to define property interests when the situation demands. The

---

**10.** By General Order of November 29, 1993, the Tenth Circuit suspended 10th Cir.R. 36.3 to allow citation of unpublished opinions in certain cases, but the opinions are still not binding precedent.

court identified the objectives of equality of distribution and promotion of reorganization as sufficient justification for not applying state law in the context of this financing transaction.

The purpose of Chapter 11 is to restructure a business' debts so that the business may continue in operation. *National Labor Relations Bd. v. Bildisco and Bildisco,* 465 U.S. 513, 527–28, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984); *see also In re FitzSimmons,* 725 F.2d 1208, 1210 (9th Cir.1984) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6179). In addition, the equitable distribution of assets is an overriding purpose of the Code. *In re Smith–Douglass, Inc.,* 856 F.2d 12, 15 (4th Cir.1988).

Those objectives would to a substantial extent be contravened if the IRB transaction is treated as a lease. The debtor's business of operating the hotel will continue only if the lease remains in effect. The bankruptcy court found that given the § 365 provision requiring a debtor-in-possession to cure any default in order to be permitted to adopt an unexpired lease, the debtor in this case, and in any case of this type, would be forced to reject the lease, thus in effect killing the reorganization attempt. In addition, the bankruptcy objective of equitable distribution would be defeated. The bankruptcy court noted that in addition to appellants, more than 100 other creditors are listed in this case. Those claims will likely never be paid in the absence of a reorganization.

It is well recognized that state law which conflicts with federal bankruptcy law is preempted by the Code. *See Ocasek v. Manville Corp. Asbestos Disease Compensation Fund,* 956 F.2d 152, 154 (7th Cir.1992); *Jones v. Keene Corp.,* 933 F.2d 209, 214 (3d Cir.1991); *In re Smith–Douglass, Inc.,* 856 F.2d 12, 15–16 (4th Cir.1988). Appellants argue, however, that the broad bankruptcy policy reasons cited by the bankruptcy court are insufficient to invoke preemption of state law. *See Justice v. Valley Nat'l Bank,* 849 F.2d 1078, 1087 (8th Cir.1988) (remedial purposes of Chapter 12 insufficient basis to preempt state law and fashion uniform federal rule); *In re Roach,* 824 F.2d 1370, 1379

(3d Cir.1987) ("Despite its appeal, a desire for a uniform result in federal bankruptcy courts does not alone warrant the displacement of state law with judge-made federal law.").

■ This court concludes that the legislative history of § 502(b)(6), read together with § 365, shows Congressional intent that an economic realities test be used to determine whether a real estate transaction should be characterized as a lease. This, coupled with the interest in fulfilling bankruptcy purposes and objectives, provides an adequate "federal interest" to justify using a federal rule rather than state law to define this particular property interest. *See Butner,* 440 U.S. at 55, 99 S.Ct. at 918. As discussed earlier, the Second and Ninth Circuits, as well as other courts, have decided without reference to state law that the economic substance of a transaction is the proper basis for deciding whether a transaction is a lease for purposes of § 365. *See In re Moreggia & Sons, Inc.,* 852 F.2d 1179 (9th Cir.1988); *In re PCH Associates,* 804 F.2d 193 (2d Cir.1986); *International Trade Admin. v. Rensselaer Polytechnic Institute,* 936 F.2d 744 (2d Cir. 1991); *In re Hotel Syracuse, Inc.,* 155 B.R. 824 (Bankr.N.D.N.Y.1993); *In re Tak Broadcasting Corp.,* 137 B.R. 728 (W.D.Wis.1992); *In re Starr,* 113 B.R. 481 (Bankr.S.D.Ill. 1990); *In re MCorp Financial Management, Inc.,* 122 B.R. 49 (Bankr.S.D.Tex.1990).

*In re Moreggia & Sons, Inc.* specifically held that an agreement which would qualify as a true lease under California state law was not a lease for purposes of § 365. In finding that state law was not controlling, the court stated that "the appropriate focus is on the federal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement." *In re Moreggia & Sons, Inc.,* 852 F.2d at 1182. The court further stated that "[s]imply meeting the state law definition of a lease will not necessarily mandate the mindless application of section 365. Rather, the substance of the agreement must properly fall within the scope of the type of agreement anticipated by Congress in enact-

ing section 365." *Id.* at 1183–84.[11]

Appellants cite several cases in which the courts determined that an economic realities test could not be applied to determine the nature of a debtor's interest in a "rent-to-own" lease when state law rejected such a test. *See In re Connelly*, 168 B.R. 714 (Bankr.W.D.Wash.1993); *In re Osborne*, 170 B.R. 367 (Bankr.M.D.Tenn.1994); *In re Morris*, 150 B.R. 446 (Bankr.E.D.Mo.1992). In those cases, the states had enacted statutes which specifically provided that the UCC test would not apply to "rent-to-own" contracts and that such contracts were not to be treated as creating disguised security interests. These cases, however, all involved contracts related to personal rather than real property and are therefore inapplicable to the case at bar. The applicable Code provision in this case, § 365(d)(4), applies only to nonresidential real property. Further, the definition provided by the legislative history to § 502(b)(6) pertains to the term "lease of real property." In contrast, there is no similar basis in the Code for applying the economic realities test in lieu of applicable state law in the context of personal property.

In this case, the bankruptcy court was correct in concluding that it was not bound by state law in defining the property interests at issue.

### 3. Use of the Economic Realities Test

■ After concluding that the economic realities test was the proper standard to apply, the bankruptcy court was correct in finding that the agreement in this case does not constitute a lease for purposes of § 365. Among the factors relevant to deciding whether an agreement constitutes a true lease under an economic realities test are the following: (1) whether the amount of rent was calculated to compensate for use of the land or rather was based on some other purpose such as ensuring a particular return on an investment; (2) whether the property was purchased by the lessor specifically for

the lessee's use; (3) whether the transaction was called a lease in order to gain certain tax advantages; (4) whether the lessee assumed many of the obligations normally reserved for the lessor; and (5) whether the agreement permits or requires the lessee to purchase the property for a nominal sum at the end of the lease term. *See In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838–39 (Bankr. N.D.N.Y.1993).

After applying these factors to the agreement in this case, it is apparent that the agreement does not constitute a true lease for purposes of § 365(d)(4). The lease payments are not related to rental value but rather are calculated to retire the bond debt in a manner similar to repayment of a loan. If the bondholder agrees to reducing the interest rate on the bonds, the lease payments would be similarly reduced. While legal title to the property is vested in the City, the site for the hotel was actually chosen by KAR. The transaction was termed a "lease" in order to meet the requirements of the Kansas IRB statute and thus to gain tax advantages. KAR has all the burdens of ownership. KAR is responsible for ad valorem taxes and all repairs and maintenance. KAR is also required to provide casualty and liability insurance. KAR is permitted to alter the facility and make additional improvements on the land without the City's consent as long as they do not affect the intended use or structural integrity. Finally, the agreement grants KAR an option to purchase the property at the end of the term and prohibit the City from selling the property before then.

Based on the facts presented in this case, the bankruptcy court was correct in concluding that the agreements do not constitute a true lease under an economic realities test.

### 4. Stare Decisis Effect of Petroleum Products

■ Finally, appellants argue that the bankruptcy court was bound to follow an

---

11. In a case decided shortly after *Moreggia*, the Ninth Circuit applied state law and concluded that an agreement was not a lease for purposes of § 365. *See In re Harris Pine Mills*, 862 F.2d 217 (9th Cir.1988). While that panel stated that

state law should control, it indicated that if the agreement had been a lease for purposes of state law then further analysis as done in *Moreggia* would be warranted. *See id.* at 220 & n. 6.

earlier decision in this district which held that state law determined the characterization of property interests in bankruptcy and, as a result, leases made pursuant to an IRB transaction are "true leases" for purposes of § 365(d)(4). *See In re Petroleum Products, Inc.,* 72 B.R. 739 (Bankr.D.Kan.1987), *aff'd,* No. 87–4127–R, slip op., 1988 WL 492079 (D.Kan. Nov. 21, 1988). According to appellants, bankruptcy courts are bound by the decisions of the district courts in their district because the district courts sit as appellate courts over the bankruptcy courts.

The flaw in appellants' argument derives from the fact that the district court is composed of more than one district judge, and one judge is not bound by the decision of another judge sitting in the same district. *See Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 & n. 7 (3d Cir.1991). Bankruptcy court decisions are reviewed by different district judges. As a result, the issue of whether the bankruptcy court is bound to follow decisions of the district court within its district cannot arise in any meaningful context. This issue arises only on an appeal from the bankruptcy court. The substantive issue is placed before this district judge who is not bound by other district court decisions.

Appellant cites several bankruptcy court decisions for the proposition that bankruptcy court judges are bound by the decisions of the district judges sitting in their district. *See In re Moisson,* 51 B.R. 227, 229 (Bankr. E.D.Mich.1985); *In re Johnson–Allen,* 67 B.R. 968, 973 (Bankr.E.D.Pa.1986); *In re Inv. Sales Diversified, Inc.,* 49 B.R. 837, 846 (Bankr.D.Minn.1985); *In re V–M Corp.,* 23 B.R. 952, 654–55 (Bankr.W.D.Mich.1982); *In re Bill Ridgway, Inc.,* 4 B.R. 351, 353 (Bankr.D.N.J.1980). These decisions, however, do not make clear the basis for this principle, and more importantly do not address the possibility that district court decisions could be in conflict. The better view, the one which reflects an understanding of the court structure and the nature of *stare decisis,* is that because district court bankruptcy decisions do not bind other district judges within the same district, they are not binding on bankruptcy courts either. *See In re Abernathy,* 150 B.R. 688, 693 n. 7 (Bankr. N.D.Ill.1993); *In re Globe Illumination Co.,* 149 B.R. 614, 619 (Bankr.C.D.Cal.1993); *In re Shattuc Cable Corp.,* 138 B.R. 557, 566–67 (Bankr.N.D.Ill.1992). As a result, the bankruptcy court was not bound under the principle of *stare decisis* to follow the decision of the district court in *Petroleum Products.*

### 5. Summary

The court concludes that the economic substance of an arrangement must be examined in order to determine whether the arrangement is to be characterized as a "lease of nonresidential property" pursuant to § 365(d)(4). Because the provision in § 502(b)(6) relating to damages allowable to a debtor's landlord is closely related to the provisions of § 365, the legislative history of § 502(b)(6) is relevant to determining the meaning of "lease of nonresidential property." The legislative history discloses a congressional intent that an economic realities test be used to determine whether a transaction constitutes a lease of real property. This congressional intent, coupled with the policies and objectives of bankruptcy, comprises a sufficient federal interest so that courts are not bound by the characterization provided by state law. Applying the economic realities test to the arrangement in this case results in finding that the agreement at issue is not a true lease for purposes of § 365(d)(4).

### B. Treatment of Revenues as Cash Collateral

In its cross-appeal, KAR challenges the bankruptcy court's ruling that the hotel revenues are "cash collateral" within the meaning of § 363(a). Cash collateral is defined, in part, as "cash ... or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest ... [including] the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after commencement of a case un-

der this title." § 363(a).[12] The significance of determining that assets constitute cash collateral is that the debtor's use of such assets is restricted.[13]

Section 552(a) establishes the general rule that property acquired after the commencement of bankruptcy is not subject to any security interest arising from an agreement entered into before the commencement of the bankruptcy case. Section 552(b), however, provides an exception under which post-petition property, including rents, may still be subject to a security interest if the debtor and secured party entered into a security agreement before the bankruptcy was filed.

■ KAR argues that the bankruptcy court should not have ruled on this issue in its August 5, 1994, Memorandum Opinion. KAR contends that the ruling was premature because the May 19–23 hearings did not encompass the cash collateral issue and because KAR has been denied the opportunity to present evidence relating to the issue. After reviewing the record on appeal, this court concludes that sufficient evidence was before the bankruptcy court to enable it to rule on the cash collateral question.

The issue was raised in a motion filed by Alchemedes and Security on December 7, 1993, in which they moved for an order prohibiting the use of cash collateral. On March 16, 1994, they filed a second motion for such an order and also requested an emergency hearing. KAR filed a response in opposition to these motions on April 22, 1994, and an application for an expedited evidentiary hearing on June 8, 1994.

The motions filed by Alchemedes and Security include documents which establish that they hold enforceable liens on the hotel revenues to secure repayment of the debts incurred by KAR. In its response in opposition to the motions, KAR primarily argued that the movants had no valid cash collateral claim in any income or revenues of the hotel generated post-petition. KAR's opposition was based on·the legal argument that hotel revenues do not constitute "rents" and therefore do not fall into the definition of cash collateral or within the exception contained in § 552(b).[14] Although KAR requested an evidentiary hearing, its response contains no suggestion that its opposition to the motion was based on factual issues. Similarly, KAR has not identified in its cross-appeal what additional facts it could have offered that would affect the bankruptcy court's ruling.

The court finds that the evidence before the bankruptcy court was sufficient for it to conclude that the hotel revenues constitute cash collateral.

The bankruptcy court's order entered on August 5, 1994, is affirmed. The Clerk is directed to transmit a copies of this order to the Clerk of the Bankruptcy Court and to counsel of record for the parties.

**IT IS SO ORDERED.**

12. Section 363(a) was amended by the Bankruptcy Reform Act of 1994 to specifically include in the definition of cash collateral "the fees, charges, accounts or other payments for the use of or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties." Pub.L. No. 103–394, § 214(b). This amendment applies only to cases filed before the date of enactment, October 22, 1994, and therefore does not apply in this case. § 702.

13. Section 363(c)(2) provides, in part, as follows:
The trustee may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

Section 363(e) further provides that:
at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

14. The court notes that KAR's legal argument is undermined somewhat by the amendments to the Code contained in the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, enacted October 22, 1994. The amendments specifically includes hotel revenues in the definition of cash collateral. Although the amendments do not apply to bankruptcy cases filed before enactment, they may be relevant to interpreting the meaning of "rents" in the pre-amendment statute.